Jones, Chief Judge,
delivered the opinion of the court:
This is a suit for the reasonable rental value of properties occupied by the United States Navy for the period June 30, 1951, to June 30,1953.
The three plaintiffs are corporations with the same stock ownership and the same officers and directors. They will therefore be referred to as the plaintiff.
The plaintiff is the owner of a reservoir lake of approximately 148' acres in area impounded by a dam across Holmes Eun in the State of Virginia. The dam was constructed *624 in 1915 by the Alexandria Water Company and until sold to the plaintiff was used by that company.
On July 1, 1945, a lease contract was entered into with the Navy Department by the terms of which 0.2 of an acre of land adjacent to the reservoir, together with the use of the reservoir and with the right of access thereto, were leased to the defendant for a term of one year beginning July 1, 1945, and ending June 30, 1946. By the terms of the lease an option was given to the United States to renew the lease from year to year until June 30, 1965, conditioned, however, upon the defendant’s giving the plaintiff at least 30 days’ written notice before the end of any lease year period of its desire to renew the lease for another year.
The lease was regularly renewed each year through June 30,1950.
On December 29, 1949, the Alexandria Water Company wrote to the Navy Department stating that that firm was not prepared to accept a renewal of the lease beyond June 30, 1950, that it contemplated the abandonment of its use of the reservoir, and had placed its Barcroft property in the hands of real estate brokers for sale. There followed conferences and negotiations.
On May 25, 1950, the Alexandria Water Company was given formal notice by the Navy Department of its desire to have the lease extended to June 30, 1951.
On June 9, 1950, the Alexandria Water Company deeded to the plaintiff the lake and accompanying acreage for the sum of $1,000,000, and-soon thereafter the plaintiff began the development of a resort area in connection with the lake.
Conferences were held on June 14 and 29, 1950, between representatives of the Navy Department and a representative of the purchasers of the lake and adjoining properties, at which time the representative of the plaintiff informed the Navy that it would require $10,000 a year rental for any period after the lease expired. The previous rental had been $2,500 per year.
There was no renewal of the lease after June 30,1951. The Navy paid the regular rental of $2,500 per year through June 30, 1951. After June 30, 1951, the Navy continued to utilize the same property until June 30, 1953. However, it *625 did not pay any rent and did not at any time give notice of its desire for a renewal of the lease contract in accordance with the terms of the lease.
On February 11, 1952, an attorney for the plaintiff sent the defendant a bill for rental at the rate of $833.33 per month, or $10,000 per year. In this letter he stated that at a previous conference with representatives of the Navy Department it was intimated without commitment that the Government would pay at least $5,000 per year. The Navy, on February 15, 1952, acknowledged receipt of the letter, stating in part :
The subject matter of your letter is being coordinated with the cognizant bureaus of the Department of the Navy and at the conclusion thereof your office will be advised with reference thereto.
Also on February 12 and again on March 17, 1952, another attorney for plaintiff who had been retained for the purpose of clearing the title to the land area, wrote the Navy Department in reference to this matter. However, no definite agreement was reached either as to continuing the lease or as to the amount of the rental.
In the meantime, the Navy continued to use the leased premises which included a shore installation as well as a barge anchored some distance out in the lake and connected to the shore by a sort of bridge structure. The barge anchored in the body of the lake was kept in place by anchor wires extending some distance in different directions, but for the most part 3% feet under water.
There is a dispute as to how much of the lake was actually used by the Navy, but if the area covered by the anchor or guy wires is considered it would amount to about 3% acres. In addition the lease provided for using the entire lake for testing underwater acoustic devices. From time to time this was done. When such testing was being done the entire lake was used, and motor boats were not permitted on it.
In the meantime the Navy Department considered, the removal of the facility from Lake Barcroft and had concluded to do so shortly before June 6, 1952, at which time it solicited bids for such removal as well as the installation of a complete facility at a lake in nearby Maryland.
*626 It is not quite clear just why the Navy did not give notice of its desire to renew the lease when by doing so it could have obtained a continuation of the lease at the rate of $2,500 per year. It seems probable from all the testimony that it did not know just how long it would want to use the property, and therefore did not want to be committed for a full year. At any rate, the proper notice was not given and since the plaintiff had indicated that it did not wish to continue the lease at the $2,500 annual rental, the Navy Department did not have the right, without giving notice or committing itself in any way, to continue holding the property at its pleasure under the terms of the lease contract theretofore prevailing. In these circumstances the defendant is obligated to pay the reasonable rental value of the premises for the period during which there was no written contract. This is true whether the defendant’s occupancy is treated as an implied contract for the use of the premises, or whether it is considered as a temporary taking by the defendant of property owned by the plaintiff. Garrity v. United States, 107 C. Cls. 92.
The plaintiff asserts that during the 2-year period the value of the property increased some sixfold. It offered the testimony of experts to the effect that $10,000 per year for the period in question was a reasonable rental. The defendant offered evidence of a much lower valuation, some of it to the effect that the reasonable rental value was less than $2,500 per year. As usual, the estimates of value by the different experts were widely at variance.
Considering the record as a whole we find that the reasonable rental value of the property occupied by the defendant for the period June 30, 1951, to June 30,1953, was $400 per month, or a total of $9,600.
There is also pending a claim for a balance of the alleged cost of restoring the premises. In all major respects the Navy fully restored the premises. The trial commissioner who heard the evidence has found that $150 would be sufficient to complete the restoration, and we approve this finding.
The plaintiff is entitled to recover the sum of $9,750.
It is so ordered.
*627 LaRAmoee, Judge; MaddeN, Judge; Whitaker, Judge; and Littleton, Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner William E. Day, and the briefs and argument of counsel, makes findings of fact as follows:
1. In 1944, the Naval Ordnance Laboratory was engaged in testing and calibrating underwater acoustic devices in connection with naval ordnance at the David Taylor Model Basin. By September 7 of that year it became necessary to remove this work to another location. After considering several available sites, the Barcroft reservoir, in Fairfax County, Virginia, was selected as ideally suited for the work because of its low level of background noise. This reservoir, the surface of which comprised an area of approximately 148 acres, was impounded by a dam across Holmes Bun. This dam had been constructed in 1915. The dam and approximately 682 acres of surrounding land including the land covered by the water of the reservoir, was owned by the Alexandria Water Company. All of ,the land surrounding the reservoir was in its natural state.
2. Negotiations were had between representatives of the Navy and the Alexandria Water Company resulting in the placing by the Navy of electronic equipment in the gate house of the dam, the placing of a small float near the gate house, and the use of electricity and telephone facilities at the gate house, all with the permission of the Alexandria Water Company pending the negotiation and the execution of a lease for such facility as the Navy wished to locate at such reservoir.
3. Thereafter, a lease dated July 1,1945, and identified as Contract NOy(B) 39184 was executed by the Alexandria Water Company, as lessor, and the United States acting through the Navy Department as lessee. Under the lease, the lessor leased the following-described premises:
At Barcroft Reservoir located 1.0 mile west of Bailey’s Cross Road, Fairfax County, Virginia, approximately 0.2 acres of land adjacent to the reservoir together with the use of the reservoir and with the right *628 of access thereto, all as set forth in plans shown on Burean of Yards and Docks drawings nos. 411,261 and 411,263, the latter revised 28 June 1945, which are attached hereto and made part hereof and designated as schedules “A” and “B”, respectively.
The term of the lease was to begin July 1, 1945, and end June 30, 1946, with option to renew as quoted in paragraph 5 below.
The premises so leased were to be used exclusively for underwater calibration experimental facilities. The lease provided in pertinent part as follows:
5. This lease may, at the option of the Government, be renewed from year to year at a rental of One dollar ($1.00) up to 31 December 1946 and thereafter at the rate of $2500.00 per annum and otherwise upon the terms and conditions herein specified, provided notice be given in writing to the Lessor at least thirty (30) days before this lease or any renewal thereof would otherwise expire : Provided that no renewal thereof shall extend the period of occupancy of the premises beyond the 30th day of June 1965.
7. The Government shall pay the Lessor for the premises rent at the following rate: One dollar ($1.00) per annum till 31 December 1946 and thereafter at the rate of $2500.00 Twenty five hundred dollars per annum. Payment shall be made at the end of each quarter.
8. The Government shall have the right, during the existence of this lease, to make alterations, attach fixtures, and erect additions, structures, or signs, in or upon the premises hereby leased (provided such alterations, additions, structures, or signs shall not be detrimental to or inconsistent with the rights of lessor); which fixtures, additions, or structures so placed in or upon or attached to the said premises shall be and remain the property of the Government and may be removed therefrom by the Government prior to the termination of this lease, and the Government shall, before the expiration of this lease or renewal thereof, restore the premises to the same condition as that existing at the time of entering upon the same under this lease, reasonable and ordinary wear and tear and damages by the elements or by circumstances over which the Govermnent has no control, excepted: * * *.
13. The Government shall have the right to install such mooring cables as may be necessary to fix the location of the facility as shown in the plans of schedule *629 “B”, with, the specific condition that the top of any such mooring cables shall not be less than 3*/2 feet below the surface of the water at any stage of water in the reservoir between the marker buoys shown in schedule “B’\
14. The existing dirt road leading from the dam to the entrance gate on the lessor’s property shall be relocated and graded by the Government for the use of the lessor as shown in Schedule “A”.
15. The Government shall have the right to build a new road from the lessor’s property line to its facility, said road to provide access for public utilities and travel. The said road to be used by the lessor in common with the Government.
22. The lessor reserves the right to inspect or patrol its Barcroft Reservoir property in connection with water works operation except for the area upon which the Government facilities are installed or constructed.
23. The Government shall maintain its facilities in such condition as not to detract from the appearance of the reservoir adjoining the property as a public water supply.
24. The Government, its agents and employees shall not in any manner interfere with the work of the lessor with respect to routine maintenance, operation, or improvements, including the operation of motorboats on the reservoir at any and all times. The lessor shall coordinate to the best of its ability its activities so as not to interfere with the Government’s use of the facility.
26. The Government, its agents and employees or contractors shall conduct all operations in a careful, diligent and prudent manner so as not to damage the property of the lessor.
4. Schedules A and B to the lease, identified as Bureau of Yards and Docks Drawings 411,261 and 411,263 referred to in the description of the leased premises, show a 20 x 30-foot shore house, a pier, float and pontoon bridge extending to a barge 32 x 44 feet, for a total distance from concrete retaining wall to the end of the barge of 229 feet.
The mooring plan shows flexible steel cable extending from each corner of the barge to a point on the shore, three of which were anchored to blocks of concrete 3 feet square at the base, and the fourth of which was to be anchored at the end of the dam. The cables to the shore on the opposite side from the shore house were about 250 and 325 feet long. The cable to the shore towards the shore house was about 260 *630 feet long and the cable to the dam was about 325 feet long. The plan further shows that marker buoys were to be located 80 feet from each corner of the barge and 60 feet from the concrete blocks on the shore with weights on the cables to keep them submerged five feet below the surface of the water between such marker buoys.
5. Pursuant to the rights granted under the lease, the United States constructed a road leading from the property line to the shore house, which was aligned with a right-of-way running over adjoining privately-owned property. In addition, the Government acquired an easement over the privately-owned adjoining premises for access to the leased area from Columbia Pike.
6. The Government leveled a portion of the premises large enough to accommodate a shore house 20 x 20 feet which it erected. It relocated, graded and surfaced an existing road that extended from the gate of the water company property to the dam. It built a retaining wall in front of the shore house and riprapping on the north side of the road leading down into the gully where drainage water flowed into the reservoir.
The Government also installed concrete gutters on each side of the road to the shore house, and constructed a catch basin and installed an underground pipe to drain the catch basin.
The units described in finding 4 were constructed in accordance with the plans therein described. The area surrounding the shore house which was generally rectangular was enclosed by a high wire fence. The fenced area was about 70 feet by 90 feet.
7. The lease was renewed by the defendant from year to year until June 30, 1951.
8. In the meantime by deed dated June 9, 1950, the Alexandria Water Company conveyed to Lake Barcroft Estates, Inc., 147 + acres of land for $300,000 cash. By another deed dated June 9, 1950, the Alexandria Water Company conveyed 534+ acres to Barcroft Lake Shores, Inc., for $700,000 represented by three notes payable one and one-half, three and four years from date of deed secured by deed of trust on the property sold. The area conveyed to both of these *631 corporations comprised the entire area occupied by the reservoir, and all the surrounding land then owned by the Alexandria Water Company. The area conveyed to Barcroft Lake Shores, Inc., included the area on which the 0.2 acre was occupied by the Navy under its lease. The line between the two pieces of property conveyed by the Water Company bisected the dam proceeding upstream across the pontoon bridge which extended from the Navy shore house. The barge and two of the concrete blocks which secured it were located in that portion which was conveyed to Lake Barcroft Estates, Inc. Both deeds referred to above recited that the conveyance was subject to an existing lease of the United States of America made by the Alexandria Water Company and the United States.
9. The plaintiffs, Barcroft Lake Shores, Inc., Lake Bar-croft Estates, Inc., and Fairfax Beach and Tennis Club, Inc., are corporations which were incorporated under the laws of Virginia. Barcroft Lake Shores, Inc., and Lake Barcroft Estates, Inc., were organized in 1950 for the purpose of subdividing a real estate development and selling lots therein. The development is known as Lake Barcroft. Fairfax Beach and Tennis Club, Inc., was organized in 1951 for the purpose of developing a resort area for the use and benefit of the subdivisions then being promoted and developed by the other two corporations.
10. All three plaintiff corporations have common officers and stockholders. David Miller is president and director of Barcroft Lake Shores, Inc., and Lake Barcroft Estates, Inc., and is secretary-treasurer and director of Fairfax Beach and Tennis Club, Inc.
Francis T. Leahy is vice-president and director of all three corporations.
Charles E. Dockser is chairman of the board of directors and secretary-treasurer of Lake Barcroft Estates, Inc., and Barcroft Lake Shores, Inc. He is president and chairman of the board of Fairfax Beach and Tennis Club, Inc.
The stockholders of all three corporations are Dockser, Miller, and Joseph V. Barger, each of whom holds one-third of the stock.
*632 Charles E. Dockser, who testified at length in behalf of the plaintiffs, stated that his official duties are executive and financial in nature, that he oversees sales and advertising, and is in charge of general administration of the corporations. He also selects counsel to represent the plaintiff corporations.
11. At the time the plaintiffs Barcroft Lake Shores, Inc., and Lake Barcroft Estates, Inc., were negotiating for the purchase of the 682 acres from the Alexandria Water Company, representatives of the plaintiffs were informed of the existing lease to the defendant and were shown portions of the lease. Also, during visits to the premises, the officers of the plaintiff corporations actually saw the portion of the premises occupied by the Navy and knew that the Navy was in possession under a lease from the Alexandria Water Company.
12. By deed dated May 31, 1951, Barcroft Lake Shores, Incorporated, conveyed to the Fairfax Beach and Tennis Club, Incorporated, 93 acres, which included the entire land area of 0.2 acre occupied by the Navy under the Government lease.
13. Notices of renewal had been timely given by the Navy to the Water Company pursuant to the terms of the lease by which occupancy had been extended through June 30, 1950 (notice of renewal dated May 10, 1949). Thereafter, on December 29, 1949, the Alexandria Water Company wrote to the Navy Department stating that that firm was not prepared to accept a renewal of the lease beyond June 30, 1950, that it contemplated the abandonment of its use of the reservoir and had placed its Barcroft property in the hands of real estate brokers for sale of such property. On January 19, 1950, the Navy Department sent the following letter to the Alexandria Water Company.
Receipt is acknowledged of your letter of December 29, 1949 advising that your Company is not prepared to accept, beyond the end of the current term, June 30, 1950, a renewal of Lease NOy(R)-39184, dated July 1, 1945 between your Company and the United States.
An examination of the lease by this Department fails to disclose any provision for the notice contained in the above mentioned letter.
Tour further advice will be appreciated.
*633 This was followed by a letter from the Navy Department to the Alexandria Water Company dated April 27,1950, which reads as follows:
Reference is made to your letter of 29 December 1949 stating that your Company is not prepared to accept the renewal of Lease NOy(R)-39184 covering 0.2 acres of land adjacent to the reservoir, Barcroft, Virginia, beyond 30 June 1950 as abandonment of the reservoir is contemplated.
Because of the nature of the experiments being carried on at the site, uninterrupted use of the facility is extremely important. In view of this and in view of the considerable expenditure made in construction of the facilities and the purchase and installation of equipment and the cost of removal and reinstallation at an alternate site, the continuation of experiments now being carried on at the site is highly important to the Navy. It would, therefore, be greatly appreciated if you would advise this Department of the name and address of the purchaser or prospective purchaser of the reservoir site in order that negotiations may be conducted for the continued use of the 0.2 acre parcel.
Your cooperation with the Department in this matter is urgently requested.
Thereafter a formal notice of renewal of the lease was executed by the Navy Department on May 25, 1950 and sent to the Alexandria Water Company, thereby extending the period of Navy occupancy to June 30, 1951. This renewal notice was acknowledged by the letter dated June 27, 1950 from the Alexandria Water Company.
This will acknowledge receipt of notice dated May 25, 1950 that the United States elected to renew the above referred to lease for the period beginning July 1, 1950 and ending June 30,1951.
This is to advise you that by deed dated June 9,1950, The Alexandria Water Company sold and conveyed to Lake Barcroft Estates, Inc. and Barcroft Lake Shores, Inc. all of its Barcroft property including the reservoir and the 0.2 acres of land adjacent thereto, now being used by the Navy Department under the lease above referred to. The sale was made subject to said lease.
A copy of the Renewal Notice for the period commencing July 1,1950, has been furnished the Purchaser, and it is assumed that arrangements for continued Navy operation under the lease will or have been made.
*634 The Alexandria Water Company will render a final invoice for rental for the period April 1, 1950 to June 9, 1950. The Purchaser will, it is assumed, invoice the Department for rental for the period June 9, 1950, to and including June 30,1950.
The address of Lake Barcroft Estates, Inc., and Barcroft Lake Shores, Inc., is 711-14th Street, N. W., Washington, D. C., and a copy of this letter is being sent to them at that address.
14. On June 14 and June 29, 1950, conferences were held between representatives of the Navy Department and Mr. Charles E. Dockser (whose corporate titles are described in finding 10). Dockser explained that the purchasers of the property proposed to subdivide the property into residential house lots and ,to set aside a recreational area for swimming, fishing, motor boating and other recreational purposes. Although Mr. Dockser testified that he was requested to enter into a new lease with the Navy, the Navy was .then in possession for another year under the outstanding lease. Mr. Dockser told Navy representatives at one of the conferences that “the company did not want to enter into any new lease, because at that point the Navy had a light to be there, but if and when the Navy got out of there, if they did stay there, they would have to pay ten thousand dollars a year rental for it for the period that they would stay there, but it was understood .that they were to seek other lake facilities and move to [an] other area for their testing center * *
15. There was no renewal of the lease after June 30, 1951.
16. Rental was paid in full by the Navy to the Alexandria Water Company through June 8,1950. For the period from June 9, 1950, to June 30, 1950, the Navy paid rental in the sum of $143 to Lake Barcroft Estates, Incorporated. For the period July 1, 1950, through June 30, 1951, the Navy paid $2,500 rental to Lake Barcroft Estates, Incorporated. No further rental payments were made by the Navy.
17. There is no evidence that notice regarding the deed referred to in finding 12 from Barcroft Lake Shores, Incorporated, to Fairfax Beach and Tennis Club, Incorporated, was ever given to the Navy Department.
*635 18. On February 11, 1952, an attorney who had been employed by Lake Barcroft Estates, Incorporated, and Bar-croft Lake Shores, Incorporated, sent the following letter to the Navy Department enclosing therewith a bill for rental as indicated:
This office represents Lake Barcroft Estates, Inc. and Barcroft Lake Shores, Inc., the purchasers of the Alexandria Water Company property adjoining Lake Barcroft and the Lake area itself, which sale was consummated during the early part of 1950.
At the time my clients acquired the property in question, the Alexandria Water Company had a lease with the United States Government, which was approved by the Secretary of the Treasury on May 6, 1935.
Immediately after this property had been acquired, my clients held a conference at the main Navy Building, Boom 0445, conferring with Mr. Agnew, Mr. Hubbard and Mr. DeWilde. At this meeting, Mr. C. E. Dockser informed the Navy Department that they were not in* terested in the renewal of the lease at Lake Barcroft since the area in question was to be divided into residential lots and that many of the land owners were using the area adjoining the lake as beaches and .that the lake itself was to be used for swimming, fishing and boating activities. Mr. Dockser further stated [they] desired the government to make arrangements to vacate the Eremises as soon as possible and suggested that he would e willing to give them as much as six months time. The government representatives were very definite in their views, stating that they would have to stay there and desired a written lease for the period of time that they would occupy the premises. In any event, they said the government should have some written memorandum from the new purchasers as to the length of time they would permit the government to occupy the same and it was suggested by Mr. Agnew that a one year lease be entered into, with a notice to vacate in ninety days and in which lease, it would be agreed that the Navy would not add to, or enlarge the physical equipment or appearance that may be seen from the surface.
During this same conference, it was brought up by Mr. DeWilde and Mr. Globe that the Navy presently had for vacating purposes, the sum of $96,000.00. They further stated that included in the above figure was approximately $17,000.00 for dismantling moving and *636 setting up certain equipment at another locating [sic], and in addition to the expense of finding a new location and a party who would be interested in having them on a lake, that they would have the expense, in accordance with tlaeir original agreement, of restoring the condition of the property, as it was at the time they entered on the same. My clients were advised at this conference that the government had built a road, pier, the laboratory house and had evidentally [sic] made some cement installations in the water and that they would be obliged, at their expense, to remove and to put it back in its original condition as set forth in paragraph 8 of the said lease.
During this conference, the gentlemen present, representing the government, inquired as to the figure Mr. Dockser had in mind regarding the annual rental and he stated the figure of $10,000.00 per year, whereupon they advised him that the budget would not pay that amount, although they might be obliged to pay the same. It was intimated at this conference, without commitment, that the government would pay at least $5,000.00 and that possibly this figure could be increased.
During the past year, I have conferred with Mr. Agnew on a number of occasions, relative to the government removing their operations from this location to another location in the State of Maryland and was informed, during the Summer of 1951, that the government had acquired a site in Maryland and that they were waiting for the Appropriation Bill before taking the necessary steps to remove their operation. Having heard nothing from Mr. Agnew, I contacted the office on Monday, February 4, 1952 and was advised by Mrs. Humphrey that the government had considered this lease terminated as of July 1, 1951. I understood from this statement, that the government had vacated the property that they were occupying, however, upon checking up on the matter, I find the government is still in possession of the premises and to date, I have heard nothing as to when they intend to vacate the premises.
My clients have received no rent since they purchased and acquired the property and were not particularly concerned about collecting the rent until the government had vacated the premises, however, since the government has continued to occupy the premises, I think that we should be collecting the rent for the premises, therefore, I am enclosing herewith original and four copies of a bill for rental of the premises from July 1,1950 to February 1, 1952. Since the Bureau of Yards and Docks *637 now consider their tenancy terminated, and the matter having been referred to yon for settlement under paragraph eight of the said lease, dealing with restoring the premises to the same condition as it existed at the time of entering upon the same, reasonable wear and tear and damages by elements or by circumstances over which the government has no control excepted. As to paragraph eight of the lease, my clients would like an opportunity to restore the premises, provided, they can be advised of the installations which the government has installed under water, at a figure to be agreed upon, in other words, if the government would advise us the amount of money that has been allowed them for the restoration work under paragraph eight of the lease, and advise us as to the concrete work under water, we will then consider restoring the property for that particular amount of money.
I would greatly appreciate it if you would advise me relative to the rental and the restoration of the property as soon as possible because my clients have subdivided Sections 1,2,3,4 and 5 of the lake area and barring any unforeseen delays, they are planning on subdividing the balance of the lake front property, as soon as possible.
Awaiting a reply, I am
The bill for rental provides as follows:
For rental at Barcroft Beservoir, located 1.0 miles west of Baileys Cross Boads, Fairfax County, Virginia, approximately 0.2 acres of land adjacent to the reservoir and with the right of access thereto, all as set forth in Plans shown on Bureau of Yards and Docks Drawings Nos. 411,261 and 411,262 [sic] from July 1,1950 to February 1,1952 $833.33 per month-Total $15,833.27.
Note : Please make checks payable to Lake Barcroft Estates, Inc. and Barcroft Lake Shores, Inc.
The receipt of the foregoing was acknowledged by letter of February 15,1952, which stated in part:
The subject matter of your letter is being coordinated with the cognizant bureaus of the Department of the Navy and at the conclusion thereof your office will be advised with reference thereto.
19. By letter dated February 12, 1952, one day after the letter from Mr. Clarke, Gardiner L. Boothe, an attorney in Alexandria who had been retained by the plaintiff corporations “for the purpose of clearing the title to the land area” *638 in order to obtain a mortgage loan on the property, informed the Department of the Navy as follows:
In June, 1950, The Alexandria Water Company conveyed to Lake Barcroft Estates, Incorporated, both Virginia corporations, all that tract or parcel of land in the County of Fairfax, Virginia, containing 147.8456 acres of land, together with all buildings and improvements thereon, subject to (1) an existing lease of the United States of America made by The Alexandria Water Company and the United States of America on the 1st day of July, 1945'; (2) any easements and rights of way over said property of the Virginia Electric and Power Company; and (3) the right of way for a sewer belonging to or now being acquired by the County of Fairfax, Virginia, together with all privileges and appurtenances belonging to the above described property.
Lake Barcroft Estates, Incorporated, the grantee above mentioned, was anxious to have this lease can-celled but at that time the Navy Department indicated that they did not wish to have it cancelled and that they expected to continue to use it. The rental was paid for the period from June 9, 1950 to and including June 30, 1950 when the transfer was made and no rent has been paid since that time. It is my understanding that you have been expecting Lake Barcroft Estates and Barcroft Lake Shores to send a bill for the rent but it seems that they were not aware of this and therefore, no rent has been paid.
Numerous houses are being built on the property at this time and the title companies are as usual raising various minor points, one of which is that this lease has not been cancelled, that it is apparently still in existence and that they have a right of way which the title companies term a “wild” right of way as it is not described with sufficient detail to indicate where it is located.
The engineers for the Lake Barcroft Estates have indicated that the right of way used by the Navy Department is a well-defined right of way on the opposite side of the lake from that on which the subdivision of lots is located but it is a matter of great importance that we should obtain the following information in order to clarify this matter:
1. Is it the intention of the Navy Department to renew this lease and if so, for what length of time, if that question can be answered ?
2. Is it true that the right of way to and from the lake or reservoir is a well-defined right of way and that *639 it is not on tho same site of tbe reservoir as the lots which have been platted and are now being sold ?
I have tried to get all the information I can on this matter as it is an important one so far as the Barcroft Estates are concerned and I find that on June 27, 1950, a letter was written to the Lake Barcroft Estates, Inc., 7ll-14th Street, N. W. by the President of The Alexandria Water Company advising them that under date of May 25, 1950, The Alexandria Water Company was advised by the Navy Department that the Government was electing to renew the Barcroft Reservoir lease for the period July 1, 1950 to July 1, 1951. In that same letter, I understand that they have never sent you any bill for the rental of the property and I will be greatly obliged if you can help me to get this matter cleared up in such a way that the title company and the lending agencies who are making the loans on the houses in that vicinity, will be able to proceed promptly with their work.
Mr. Boothe again wrote to the Department of the Navy about the matter on March 17,1952.
20. In reply to Mr. Boothe’s letters of February 12 and March 17, 1952, the Department of the Navy on March 28, 1952, advised him as follows:
Receipt is acknowledged of your letter dated March 17, 1952, relating to the lease from the Alexandria Water Company, Lessor, to the United States, NOy(R)-39184, covering 0.2 acre of land in Fairfax County, Virginia, for use for Underwater Calibration Experimental Facilities, Barcroft, Virginia.
You request to be advised as follows:
“1. Is it the intention of the Navy Department to renew this lease and if so, for what length of time, if that question can be answered ?
“2. Is it true that the right of way to and from the lake or reservoir is a well-defined right of way and that it is not on the same side of the reservoir as the lots which have been platted and are now being sold ?”
In answer to your first question, plans are now under way for the removal of the Calibration Station from its present location on Lake Barcroft to another site which is not located within the area purchased by the Lake Barcroft Estates, Inc. The exact date the move will be completed is not known but action is being taken thereon at the present time and the move will be accomplished as soon as possible.
*640 In answer to your second question, the right of way to and from .the lake or reservoir is a well-defined right of way and is not located on the same side of the lake or reservoir as the lots which have been platted.
A copy of that letter was sent to Mr. Clarke.
21. Upon receipt of the letter of March 28,1952, from the Navy, Mr. Boothe then wrote to Jack E. Cochrane, Head, Realty Legal Section, Department of the Navy, and stated;
Please accept my sincere .thanks for your letter of March 28th explaining that it is the intention of the Navy Department to remove the Calibration Station from i,ts present location on Lake Barcroft to another site which is not located within the area purchased by Lake Barcroft Estates, Incorporated.
I note the exact date the move will be completed is not known but action is being taken thereon at the present time and the move will be accomplished as soon as possible.
I further note that in answer to my second question the right of way to and from the lake or reservoir is a well-defined right of way and is not located on the same side of the lake or reservoir as the lots which have been platted.
While I think the position of the title companies was exceedingly technical, it is a matter of a great deal of satisfaction to have this matter settled as a number of loans on houses being built in that locality have been held up on account of this situation.
22. The Navy Department had in the meantime considered the removal of its facility from Lake Barcroft to another location and had concluded to do so shortly before June 6, 1952, the date of solicitation of bids for such removal, as well as the installation of a complete facility at a lake in nearby Maryland.
23. A contract identified as NOy 71713, prepared pursuant to Navy specification No. 33116, was let by the Navy on June 26, 1952, to the Corning Construction Company, a private contractor, who was the successful bidder. The contract provided for the relocation and construction of the underwater acoustic calibration facility at Brighton, Maryland. Section 28 of the contract provided for the dismantling of the facility at Barcroft and for the restoration of the premises as follows:
*641 28-01. General requirements.- — -The contractor shall . furnish all labor, equipment and services necessary for and incidental to restoring the property at Barcroft Dam, Virginia, to its original state, prior to the occupancy of the Government, in accordance with the requirements of these specifications.
28-02. Work. — The Contractor shall remove the shore house, pier, concrete retaining walls, fence, roads, drains, underground utilities, concrete dead men, barge house and barge, all cables, anchors and incidental items installed by the Government or their employees at the site of Barcroft Dam, Virginia. The items removed shall be the property of the Government and shall be stored, reused or disposed of as set forth hereinbefore in these specifications or as directed. The site shall be graded as nearly as possible to its original contours as evidenced by the surrounding terrain and shall be left in as clean and natural state as is possible.
28-03. Limits. — All items not specifically mentioned hereinbefore or on the plans as items to be reused, shall be the responsibility of the contractor to store and stack on the site at Barcroft Dam in a state ready to transport. The actual transportation of these items shall not be a part of this contract.
The contractor shall visit the site and determine the work to be done to his own satisfaction before submitting a bid.
24. Section 28 was included in the contract to the Corning Construction Company for the purpose of complying with the provisions of paragraph 8 of the lease under which the United States was obligated to restore the premises at Barcroft as nearly as possible to their original condition. The entire cost of relocating the facility at Brighton, and of restoring the premises at Barcroft, was $121,483. A breakdown of the total contract bid disclosed that the restoration cost for dismantling and restoring the premises at Barcroft, as computed by the contractor, was $1,500. Prior to making a final inspection of the work being done by the Corning Construction Company, representatives of the Navy conferred with representatives of the plaintiffs in an effort to have a mutual understanding of the condition in which the Navy would leave the site upon completion of the work.
*642 25. After the contract had been let for the dismantling and restoration of the premises at Barcroft, Mr. Bolling B,. Powell, Jr., as counsel for Barcroft Lake Shores, Inc., addressed the following letter to the Corning Construction Company on September 23,1952:
I represent Barcroft Lake Shores, Inc., in connection with its claims against the United States Navy for compensation for the use of its property at Barcroft Dam, Virginia, and also for the restoration of its property to its original state upon the abandonment of it by the Navy.
The Navy Department has advised me that you were the successful bidder on the Navy’s invitation for the construction of the new under-water calibration facilities at Triadelphia Lake, Brighton, Maryland, and for restoration of the Barcroft Dam property to its original state.
It occurs to me that you might be interested in exploring the possibility of negotiating a cash settlement with Barcroft Lake Shores, Inc., in lieu of actually restoring its property to the original condition. The Navy Department has advised me that they would have no objection to this procedure and that their only interest is in having the Barcroft property restored to a condition completely satisfactory to Barcroft Lake Shores, Inc.
Section 28 of the Navy’s invitation to bid (NavDocks Specification No. 33116), as you know, contains a general description of the work to be done to effect this restoration. We would be interested in negotiating a cash settlement on the basis of what it would cost to effect this restoration. If you would be interested in going into such negotiations it would be appreciated if you would advise me so that we may set up a conference for that purpose.
26. On November 26,1952, Mr. Powell again wrote to the Corning Construction Company as follows:
Following up my recent conversations with you concerning the restoration of the property now occupied by the Navy at Barcroft Dam, Virginia, to its natural state, I made arrangements with the Navy Department for the contracting firm of Landrith & Huddleston of Alexandria, Virginia, to inspect the Navy installation at Barcroft for the purpose of submitting to Lake Bar-croft Estates, Inc., a firm and accurate bid on the restoration work.
*643 Under date of November 20, 1952, Landrith and Huddleston submitted a firm price for doing this work. They have quoted a price of $10,000.00 for effecting tbe work required by Section 28-01 and 28-02 of tbe Nav-Docks specifications No. 33116. In addition, tbey have quoted a price of $5,000.00 for tbe work described in Section 27-01 (a) of these specifications. A special quotation was made by them in the Section 27 work of removing electrical equipment from tbe Barcroft Reservoir installation for tbe reason that there appeared to be some doubt as to whether the Navy was going to do this work with its own personnel, in whole or in part, and also, if the work was to be done by the contractor without any assistance from the Navy, who might desire to do that portion of the work itself since it apparently is charged with the responsibility of reinstalling the removed electrical fixtures at the new Triadel-phia installation.
Their bid, therefore, for doing all of the work required in Sections 28-01, 28-02, and 27-01 (a) would be $15,000.00, broken down as explained above.
Should your firm be interested in negotiating a cash settlement in line with these figures instead of performing the restoration work at Barcroft, we would be very interested in discussing the matter with you.
27. The original petition in this action was filed in this court on December 22, 1952, on behalf of plaintiff Barcroft Lake Shores, Inc., only. The additional plaintiffs were included by amendment to the petition.
28. After suit was filed, the Navy facility at Lake Bar-croft was dismantled. Testing and calibration were continued until shortly before April 1953. By April 17, 1953, the barge, pier, pontoon bridge and the shore house had been either removed or torn down and the concrete retaining wall at the shoreline was in the process of being removed by the Corning Construction Company.
29. While the work of dismantling and restoration was in progress, Mr. Powell addressed a letter dated May 19, 1953, to the Naval Ordnance Laboratory, to which was attached a copy of a letter dated May 1,1953, from Basil M. DeLash-mutt (plaintiffs’ surveyor). In that letter and its enclosure, the defendant was informed that Lake Barcroft Estates, Inc., desired the defendant to restore the premises but that the plaintiff would have no objection if the premises were left *644 unrestored in certain particulars which, were specifically enumerated and identified as eight separate items, as follows:
1. The roadway leading along the boundary line over to the Dam Site be left in place.
2. The roadway leading downhill directly ,to the Navy Site be left in place as far as the Sanitary Sewer Manhole recently constructed. The remainder of the paved area (beyond the Manhole) be removed.
3. The concrete valley gutter along the north side of entrance road be left in place for its entire length.
4. The concrete valley gutter along the south side be left in place down to the angle point. That portion below the angle point should be removed.
Note : After that portion of the gutter below the angle point has been removed a new under drain should be installed across the entrance road to carry storm water from the gutter across to the north side of said road. Incidentally, there is an existing under drain running from the end of the present gutter across the roadway and emptying out on the north side, this was installed by the Navy. As a suggestion, they might agree to install the new one rather than remove the old one.
5. Eemove remains of concrete building foundation.
6. Eemove remains of concrete bulkhead.
7. Eemove miscellaneous debris.
8. Area between large oak tree, located on high knob, and the water, including the area where roadway surface is to be removed, should be re-graded to pleasing contours. After re-grading is completed adequate top soil should be placed, hand raked and seeded.
Note : The re-grading I have in mind does not require complete restoration to the original contours. It would be more of a smoothing out job to be done with good clean material.
Should the future development of this area require the removal of any of the roadways, etc., it can be done at a nominal cost and in the meantime some use might develop for them. Even if you decide to set up two or three home sites in the area the roads may be utilized for driveways.
30. Eestoration to the condition which had existed prior to occupancy by the Navy was effected by Corning Construction Company by June 30, 1953, except in the following particulars:
1. The roadway leading along the boundary line over to the dam site was left in place.
*645 2. The roadway leading downhill to the shore house site was left in place.
3. The concrete valley gutter on both sides of the latter described roadway was left in place.
4. The surface of the area where the shore house had been located, while regraded to pleasing contours, was not covered by topsoil.
31. At the conclusion of the pretrial and prior to the taking of any testimony, the Commissioner, at the request of and in company of counsel for the parties, inspected the site. In view of the express waiver of the restoration as to items 1, 2 and 3 in finding 29, it is found that restoration was effected except for the placing of not more than six truckloads of four cubic yards each of topsoil. While the proof is not specific as to the cost of this work, $150 would appear reasonable to cover the cost thereof.
32. By June 30,1953, the Navy withdrew from the site and advised the plaintiffs’ attorney accordingly.
33. Thereafter plaintiffs’ surveyor surveyed the land in the general area of the site which the Navy had occupied and prepared a map of the survey bearing date September 1953.
34. While the Navy was in possession of the 0.2 acre and the designated portions of the lake during the years July 1, 1945, to June 30,1953, it occupied only the 3,348 square feet of the lake designated in drawings Nos. 411,261 and 411,263, attached as part of the lease contract, and with only two known exceptions the Navy did not go outside of the barge onto the lake. In one of those two instances representatives from the David Taylor Model Basin tested a self-propelled buoy which was run off one end of the barge about 100 feet into the lake. The other occasion occurred when a test was made by tying a sound source between one end of the dam and the barge, and this sound source was located about 50 feet from the barge.
By the provisions of the lease, the Navy was required to maintain all mooring cables at least 3% feet below the surface of the lake and it did not interfere with the use by others of the 3.5 acres covered by such mooring cables, except perhaps, when actual tests of short duration were being conducted.
*646 35. During the time the Navy was in possession of the premises, it maintained its installations in good condition and did not permit them to become dilapidated. And from observation—
The area that the Navy used was apparently upon the surface a simple installation of some calibrating testing that they were carrying out, but there was nothing to indicate any security or any gigantic importance attached to the operation * * *
There never was any more than one man there, and it was a harmless-looking building, a boathouse that they had there and some pontoons * * *.
The Navy did not quarter any men at the facility.
The Navy did not carry on any activities which interfered with the general use of the remainder of the property which was not under lease and was not occupied by the Navy. It did not carry on any manufacturing activity, did not store supplies or junk on the premises, did not conduct any noisy activities, and did not discharge any pollutive substances into the air or water. The only traffic to the installation was the daily attendance of one or two technical experts assigned to conduct the tests and a delivery truck which visited the premises every four to six weeks.
During the time the Navy was in possession of the premises, it did not interfere in any way with the sale of lots in the subdivision being developed by the plaintiffs. This is established by the fact that after spending $1,217,927.19 in additional improvements after the purchase of the entire property, the plaintiffs sold over 80% of the lots and received $5,200,000 between 1950 and June 30, 1953, while the Navy was in possession of the leased premises.
Lake Barcroft Estates, Inc., first commenced development of the property in 1950 by opening up Section 1 of the subdivision and, after selling 95% of the lots in that section, then proceeded to open for sale the succeeding sections. The plaintiffs offered no satisfactory evidence to prove that the presence of the Navy facility resulted in damages to the real estate development or interfered with the sale of lots and building of homes. On the contrary, many fine and expensive homes were built in the subdivision just across the lake and in full view of the Navy facility.
*647 36. From July 1, 1951, to June 30, 1953, the highest and best use of the 0.2 acre occupied by the Navy was as residential property.
37. From all of the evidence it is found that the reasonable rental value for the use of the plaintiffs’ property by the Navy Department from July 1, 1951, to June 30, 1953, inclusive, is $4,800 per year or a total of $9,600.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United States nine thousand seven hundred and fifty dollars ($9,750.).