**CONSUMERS ICE COMPANY, a
California corporation**

v.

**The UNITED STATES.**

No. 815–71.

United States Court of Claims.
March 16, 1973.

Douglas B. Martin, Jr., San Francisco, Cal., attorney of record for plaintiff.

Herman L. Fussell, Washington, D. C., with whom was Asst. Atty. Gen. Kent Frizzell, for defendant.

Before COWEN, Chief Judge, DURFEE, Senior Judge, and DAVIS, SKELTON, NICHOLS, KUNZIG, and BENNETT, Judges.

## ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

BENNETT, Judge:

The uncontested facts of this case present the court with the problem of interpreting, on cross-motions for summary judgment, the language in a written lease in which the plaintiff, Consumers Ice Company, is the lessor and the defendant, the United States, is the lessee. For reasons to be stated, the court grants the plaintiff's motion for summary judgment on the issue of liability alone and remands the case, pursuant to Rule 131(c), to the Trial Division for further proceedings on the issue of damages. The defendant's cross-motion for summary judgment is denied.

■■ Before addressing the merits of this case, it must be noted that the named plaintiff, Consumers Ice Company, a California corporation, was dissolved on April 18, 1972, after commencement of suit in this court. All assets, including this claim, were distributed to the shareholders who, in turn, have conveyed them to Texas International Company, a Delaware corporation. Our Rule 61(a) provides that every action shall be prosecuted in the name of the real party in interest and Rule 61(b)

says that the capacity to sue shall be determined by the law of plaintiff's domicile. Counsel appear to be agreed that the shareholders should now be substituted as plaintiffs, having received their interest by operation of law and that, according to California law, the shareholders can continue the suit. Plaintiff concedes that Texas International Company cannot be substituted as plaintiff without consent of the United States because of the Assignment of Claims Act, 31 U.S.C. § 203 (1970). On the latter point, defendant has been silent. There are various exceptions to this Act by operation of law. Webster Factors, Inc. v. United States, 436 F.2d 425, 429, 193 Ct.Cl. 892, 900–901 (1971). Among these exceptions is one stating that claims are not barred by successor corporations where their rights are gained by consolidation or merger with the original claimant corporation, all of whose assets and liabilities are transferred to it. Seaboard Air Line Ry. v. United States, 256 U.S. 655, 41 S.Ct. 611, 65 L.Ed. 1149 (1921). From the papers now before the court, this appears to be the situation here. The purposes of the Act, often stated, to prevent fraud, to avoid multiple litigation, and to protect the defenses the United States may have against the assignor by way of setoff and counterclaim, would not appear to be violated by substitution of Texas International Company as plaintiff and the real party in interest. However, it is not necessary to decide this issue now, as between the shareholders and Texas International Company.[1] They may resort to the procedures afforded by Rule 66(c) and move accordingly, the issue to be resolved at the Trial Division level in the proceedings connected with determination of damages. In the interim, for convenience of reference and historical reasons, plaintiff will continue to be referred to as Consumers Ice Company.

The lease in question[2] was executed on October 29, 1954, between the Consumers Ice Company and the Army Corps of Engineers for a parcel of land located in San Mateo County, California. The land covered by the original lease is 8.55 acres near the center of a larger undeveloped tract of approximately 1100 acres owned by the plaintiff. The Army wished to use the property as part of the anti-aircraft facilities protecting the San Francisco Bay area with the Nike-Hercules missile. A radar installation was constructed on the land covered by the lease, which installation is still in operation.

The lease required the Government to pay a nominal rent of one dollar per year, which is all the defendant paid for the use of this property up to 1969 when the plaintiff stopped accepting the checks. The apparent motivation on the part of the plaintiff for entering into this agreement was the fact that the Government had been prepared to condemn the property in 1954 and the plaintiff felt that a lease at a dollar per year was preferable to the loss of the fee interest in the property at that time.

The focus of the problem in this case is the interpretation to be given clause No. 3 of the lease, which reads as follows:

3. To have and to hold the said premises for the term beginning July 1, 1954, through June 30, 1955, provided that unless and until the Government shall give notice of termination in accordance with provision 6 hereof, this lease shall remain in force thereafter from year to year without further notice; provided further that adequate appropriations are available from year to year for the payment of rentals and *provided further that this lease shall in no event extend beyond June 30, 1964, or as long as required for Anti-aircraft purposes.* [Emphasis added.]

---

1. West Aspen Company, a Colorado corporation, a wholly owned subsidiary of Texas International Company, is now owner of the real estate portion of the assets transferred from Consumers to its shareholders and then to Texas.

2. Lease No. DA 04–203 ENG 3783.

The problem comes in determining how long the parties intended this lease to run. The plaintiff served notice on the Government in a letter dated May 22, 1969, to vacate the property covered by the lease before July 1, 1969. The defendant responded by a letter dated June 9, 1969, in which it asserted its right under the lease to continue to occupy the premises. Each party interprets the emphasized passage, *supra*, in a different way, which requires this court to sort out the various interpretations and come up with the reading that is most reasonable under the total circumstances involved.

The plaintiff contends the lease expired no later than June 30, 1964. Thereafter, the Government was a mere tenant at will who could stay only as long as the lessor did not voice objection by giving a 30-day notice to vacate. Thus, the Government occupied the premises from July 1, 1964 through June 30, 1969, as a tenant at will and has stayed in possession of the property after that time against the will of the plaintiff for which the plaintiff now seeks a reasonable rental value from June 30, 1969 until the date of judgment. The Government's interpretation of the lease emphasizes the language "or as long as required for Anti-aircraft purposes." It feels the lease is still in full force and effect and will continue to be so until it is determined by the appropriate military authorities that the property is no longer needed for the anti-aircraft defenses of the San Francisco Bay area.

Clearly, the interpretations given the identical language by the two parties are entirely at odds. The language of clause No. 3 of the lease is certainly not a model of legal drafting, and as a result, the court finds itself in the position of determining, if possible, which of the two competing alternative phrases ["this lease shall in no event extend beyond June 30, 1964" or "or as long as required for Anti-aircraft purposes"] controls the duration of the lease. In attempting to explain this ambiguity, the two parties have each pointed to the language in several supplemental agreements which were executed following the lease itself.

Each of the supplemental agreements concerned further additions to the leased property or rights-of-way and licenses appurtenant thereto. None of the subsequent agreements specifically attempts to modify the intended duration of the lease although several paraphrase clause No. 3 in the lease while referring to it. In so doing, they neither add to, nor subtract from, the already sufficiently confusing language in the lease itself, and will not be detailed further. The Government, however, does place heavy emphasis on a letter written February 5, 1964, approximately 5 months before the date plaintiff contends the lease terminated. In pertinent parts, this letter reads:

> In accordance with paragraph No. 3 of the subject lease, this is to advise you that the Government has a continuing need for the premises described in said lease for anti-aircraft purposes for an indefinite period.

The plaintiff did not respond to this letter, which the defendant asserts serves to indicate the plaintiff believed the lease was to run until the Government no longer had a need for the property for anti-aircraft purposes. The court does not feel it can draw such a telling conclusion concerning the plaintiff's belief of the content of this lease from its mere silence. It is just as likely that the plaintiff still viewed the lease as terminable on June 30, 1964, but since it had no objections to the defendant's continued occupancy for the immediate future, it simply did not respond to the letter of February 5, 1964. In short, none of the supplemental documents executed by these parties provides any assistance in determining what the legal interpretation of this lease should be.

While it might be like placing the cart before the horse to discuss the matter at this point since no analysis has as yet been made of the possible in-

terpretations this lease might be given, it should be noted that the pertinent language contained in clause No. 3 of the lease was typed into a standard form Government lease, and was apparently the product of negotiations between the parties in 1954. As a result, the *contra proferentem* rule [3] has no application to these facts. Kaiser Aluminum & Chem. Corp. v. United States, 388 F.2d 317, 181 Ct.Cl. 902 (1967); Tulelake Irrigation Dist. v. United States, 342 F.2d 447, 169 Ct.Cl. 782 (1965). It seems likewise clear that since the contract language was the product of negotiation, neither party may be called to task for failing to seek clarification of what seems to be language that is ambiguous on its face. The duty described in Blount Bros. Constr. Co. v. United States, 346 F.2d 962, 171 Ct.Cl. 478 (1965), and Beacon Constr. Co. v. United States, 314 F.2d 501, 161 Ct.Cl. 1 (1963), to seek clarification of obviously ambiguous contract language is nothing more than the other side of the coin from the *contra proferentem* rule.

■■ The court then is left with the alternative possibilities of either enforcing the contract between the parties by finding, if possible, a reasonable means of assigning a definite interpretation to the language in clause No. 3 without undertaking to write provisions into the contracts when the record fails to show what the parties actually intended, 3 Corbin, Contracts § 541 (1960), or finding that the ambiguity went to the heart of the contract while both parties held reasonable, but different views of what the contract meant, so that it can be said that no contract existed at all because there was no "meeting of minds." Courts will generally not follow the latter course, typified by the "Peerless"

case,[4] if there is any reasonable means of giving effect to the contract at issue. The rule of the "Peerless" case has been dealt with more recently by other federal courts in Oswald v. Allen, 417 F.2d 43 (2d Cir. 1969), and Julius Kayser & Co. v. Textron, Inc., 228 F.2d 783 (4th Cir. 1956), but in neither of these situations had the parties acted, for any appreciable period under the terms of the disputed contract. In the case at hand, the lease clearly governed the parties' actions through 1969, a period of 15 years. Such a document should not be lightly found to be without effect at this late date. This court has said before that where there is a gap in an agreement due to the fact that there was clearly no meeting of the minds with respect to a certain issue, that gap will not be "permitted to swallow the whole contract except perhaps where the gulf is far closer to the bounds of the entire consensual perimeter than here." WPC Enterprises, Inc. v. United States, 323 F.2d 874, 879, 163 Ct.Cl. 1, 11 (1963). For these reasons and because this case does not involve an "equivocal" term [5] in the contract, but instead turns on simply deciding which of two competing phrases in a clause should be given priority, the court feels that adoption of the "Peerless" rule would be improper in this case since the contract language can be given a reasonable interpretation by using other devices for interpreting the agreement.

It may reasonably be inferred from the conduct of the parties in agreeing to the language of clause No. 3 in the first place, that each party assumed that the other held its view of what the lease actually meant, but in the face of the almost painful ambiguity of the clause they each kept quite still in order not to make waves or find out for sure how the

3. *See* Chris Berg, Inc. v. United States, 197 Ct.Cl. 503, 455 F.2d 1037 (1972); Mountain Home Contractors v. United States, 425 F.2d 1260, 192 Ct.Cl. 16 (1970); WPC Enterprises, Inc. v. United States, 323 F.2d 874, 163 Ct.Cl. 1 (1963); Peter Kiewit & Sons' Co. v. United States, 109 Ct.Cl. 390 (1947).

4. Raffles v. Wichelhaus, 2 Hurl. & C. 906, 159 Eng.Rep. 375 (Ex. 1864).

5. *See generally* 64 Colum.L.Rev. 619 (1964).

other party viewed the agreement. It could be said that both parties seemed to be keeping their cards close to their chests throughout the period from 1954 to 1969. The court's problem is to decide which of the interpretations is most reasonable under the total circumstances.

In order to do this, it seems necessary for the court to read one of two additional phrases into the pertinent portion of clause No. 3 by implication if it is to be given a valid meaning. The clause must read: " * * * and provided further that this lease shall in no event extend beyond June 30, 1964, or as long as required for Anti-aircraft purposes," adding *whichever occurs first* or *whichever comes later*. To read the clause as the Government would desire [whichever comes later] places the termination of the lease strictly within the discretion of the appropriate military authorities to determine when, in fact, the land is no longer "required for Anti-aircraft purposes." Such a need has obviously existed for some 19 years now and it seems unlikely that such a need would diminish in the near future. The plaintiff argues that whether or not the defendant requires the property for the specified purpose should be a justiciable issue. The court does not agree that it has a role in determining what the military's needs might be in this or any other situation in which informed discretion is so important to making a decision concerning tactical military requirements. In the alternative, the plaintiff would then like to classify the lease, assuming the defendant's view is adopted, as a lease in perpetuity and unenforceable as such. The defendant, of course, does not agree that this lease grants rights to the Government in perpetuity, but it is obvious that if the defendant's view is adopted, the lease is certainly for an indefinite term with the ultimate decision as to the precise duration controlled solely by the defendant.

 While it is clear that the terms of the lease do not specifically define a period in perpetuity, it is also clear that the lease could continue for such a long period of time as to constitute, for all practical purposes, a perpetual right to occupation, should the Government feel there was a continuing need for the land for the designated purpose. The fact that a contract leaves indefinite the period for performance will not usually invalidate it or make it unenforceable, but the longer the period for performance the heavier the burden on the enforcing party to prove that the extended duration was intended. Thus, contracts for performance in perpetuity may be valid, but under certain conditions are considered unreasonable and contrary to public policy. 3 Corbin, Contracts § 553 (1960). There is, therefore, an apparent judicial reluctance to interpret any contract to require performance in perpetuity, and some of this reluctance should carry over to situations in which there exists a visible possibility that a contract might extend in practical perpetuity. Such a possibility is a relevant factor in determining which of two competing interpretations is the most reasonable.

The judicial reluctance to uphold contract interpretations calling for extended or perpetual performance finds even stronger expression in the Restatement of Property § 19 (1936):

> If the duration of the estate attempted to be created by the lease is not stated and cannot be precisely computed at the time when the estate becomes possessory, the estate is not an estate for years.

 The court is not going to attempt an analysis of the variety of possible characterizations to which the language of the lease in question could be subjected, since it does not change the result in this case, but it should be noted that where an estate for years fails due to indefiniteness, a lesser estate such as a tenancy at will will result. This points once again to a judicial reluctance to lock parties into a given set of rights and obligations for long or indefinite periods without some clear indication

that this was actually intended by the parties. The defendant has not shown, either through the language of the lease or the subsequent actions of the parties, that there was a clear indication that both parties knew or should have known the lease was to continue indefinitely. McLean v. United States, 316 F.Supp. 827 (E.D.Va.1970).

The defendant's interpretation of this lease has at least one other difficulty, and that is if the lease was to run so long as the Government "required for Anti-aircraft purposes," why was the June 30, 1964 date placed in the lease at all? The only possible explanation is that if the defendant were to find it no longer needed the property for the designated purpose prior to June 30, 1964, it could use it for some other purposes until that date. Such an explanation seems unlikely and outside the general purpose for which the defendant sought the particular piece of property in the first place.

 The plaintiff's interpretation does not seem to suffer from the difficulties inherent in the defendant's view. Plaintiff's view clearly leaves no room for a lease in perpetuity at the defendant's discretion. Under this interpretation the lease would terminate on June 30, 1964, or sooner should the Government cease to have a further need for the property for anti-aircraft purposes. This view is also far more in line with what a reasonable businessman might do in exchanging valuable property rights for a nominal consideration. The Government asserts, however, that while it might be said the plaintiff made a bad bargain back in 1954, which it came to realize in 1969, when it tried to force the Government to vacate the property, the court should not look behind the consideration for the agreement when asked to enforce the terms of the contract. This, as a general proposition, is certainly true where the contract is clear or should be clear to the party against whom the agreement is being enforced; but where the contract terms are as ambiguous as these terms, the court is free

to examine the reasonableness of the business transaction in order to determine which of several competing interpretations is most reasonable and likely under the total circumstances including the business realities of the case. See 3 Corbin, Contracts § 553 (1960).

Further support for the court's conclusion may be found in the opinion in United States v. 77 Acres of Land, 88 F.Supp. 349 (S.D.Ala.1950). In this case, the plaintiff owned land near Mobile, Alabama, on which the Government wanted to build housing for personnel from a nearby shipyard during World War II. The Government had started condemnation proceedings in order to obtain rights to the property, but before they were concluded, the plaintiff entered into a voluntary lease with the Government in August 1943, for the consideration of one dollar per year, for a set term, but with the Government having the right to extend the lease for additional yearly periods "during the present state of war and during three years thereafter." The war officially ended December 31, 1946, by Presidential proclamation although actual hostilities ceased in August 1945. The Government attempted to retain possession after 1948 and for 3 years after the continuing post-war "national emergency" would later expire. In interpreting the contract in order to determine if the Government had a right under the lease to retain possession during a period of "national emergency," the court said:

 * * * It would be most unreasonable to assume that any citizen for so nominal a consideration intended to grant the use and occupancy of his property for an indefinite period, especially when the indefiniteness of that period depends upon the mere fiat or order of the other party to the contract, the government or one of its agencies. * * * [88 F.Supp. at 352.]

That court allowed recovery of reasonable rental value for use and occupancy by the Government from and after December 31, 1949, the date of taking

without due process. The issues of notice and eviction are not involved in that case. While the language in the lease now before the court is not so clearly drawn, the reasoning employed by the Alabama District Court is equally applicable to the case at hand. What the reasonable person would do in the situation is a relevant consideration when deciding what certain contract language means in light of the total circumstances.

For all of the reasons discussed, the court feels the plaintiff's interpretation of this lease is the most reasonable under the total circumstances. In reaching this view, the court is not going to deal with the matter of whether the defendant's occupation of the property from June 1964 through June 1969 was as a tenant at will or as a tenant from year to year. In either case, the applicable California law (§§ 789, 1946 of the California Civil Code) requires only that the tenant be given 30 days' prior notice to vacate. While the notice requirements of the California Code may not be dispositive of this issue, as the defendant points out, the court will apply this rule since the defendant has not provided a contrary federal standard covering the length of the notice period and our search has revealed none. As a result, the court finds that the notice given by this plaintiff on May 22, 1969, was sufficient to satisfy a 30-day requirement. Defendant's continued occupation after June 30, 1969, constitutes a temporary taking, without due process, of a leasehold interest of plaintiff's property from that date. It should also be noted that in reaching the conclusion urged by the plaintiff, these parties will be left in roughly the same position they were in 1954. The defendant, if it still has a need for the property in question, can try to negotiate a new and, hopefully, clearer lease with the plaintiff at a reasonable rental for the future, or it can proceed to condemn the property and pay the plaintiff a reasonable amount for the rights received. In neither event can it be said that the nation's defense has been threatened or the Government's interests prejudiced since the Army did make use of the property for some 15 years while paying only $15 for the privilege.

In summary, for all of the reasons given, the plaintiff's motion for summary judgment is granted, while the defendant's cross-motion is denied. The matter is referred, pursuant to Rule 131(c), to the Trial Division for further proceedings on the issue of damages which will be for reasonable rental value of the property occupied after June 30, 1969, the date fixed in the notice to vacate, to date of judgment. R. J. Widen Co. v. United States, 174 Ct.Cl. 1020, 357 F.2d 988 (1966). Plaintiff's claims for damages for trespass upon its adjacent lands appear to sound in tort and therefore would be outside our jurisdiction as pleaded. Consideration of such claims if tenable will await final disposition upon the recommended decision of the Trial Division in connection with the further proceedings discussed above.