**FLORIDA KEYS AQUEDUCT AUTHORITY**

v.

**The UNITED STATES.**

No. 51–82C.

United States Claims Court.

Jan. 23, 1985.

Enrique Arroyo, Coral Gables, Fla., for plaintiff; Gaston, Snow & Ely Bartlett/Hall & Swann, Coral Gables, Fla., of counsel.

Sara V. Greenberg, Washington, D.C., with whom was Acting Asst. Atty. Richard K. Willard, Washington, D.C., for defendant; David M. Cohen, Director, Sandra P. Spooner, Asst. Director, Washington, D.C., of counsel.

## OPINION ON CROSS–MOTIONS FOR SUMMARY JUDGMENT WITH RESPECT TO COUNT III OF THE COMPLAINT

PHILIP R. MILLER, Judge:

Plaintiff, Florida Keys Aqueduct Authority (FKAA), is a state agency the purposes and functions of which are to obtain, supply, and distribute an adequate water supply for the Florida Keys. Its complaint alleges that during the years 1940 through 1942, the United States, acting through the Department of the Navy (Navy) constructed a water pipeline in the Florida Keys by means of which water was supplied to military and naval installations and to the civilian population. Until the year 1974, the water pipeline was operated by the Navy. Water not needed for military and naval installations was, prior to 1974, sold by the United States, to FKAA and its predecessor, Florida Keys Aqueduct Commission, for distribution to the civilian population. In 1974 FKAA decided that it was desirable for it to own the pipeline and entered into discussions with the Navy for its purchase. As a result, on June 26, 1974, the United States and FKAA entered into a contract to transfer the Navy water pipeline to FKAA with the United States thereafter purchasing its water from FKAA for use by the various government installations in the Keys. FKAA agreed (1) to supply the water to the United States installations at the reduced preferential rate set forth in the contract; (2) to give the United States credit for the value of the pipeline as of the time of transfer, $2,753,226.03, to be applied against the government's water bills in accordance with a formula contained in the contract; (3) to furnish the United States fresh potable mainland water on a priority basis over its other customers; and (4) to guarantee to the government, at such locations as it desires the supply of 6.0 million gallons per day of the water supply system transferred.

In Count I of the complaint, plaintiff claims damages for misrepresentation by Navy representatives of the condition of the water pipeline and related equipment and facilities, upon which plaintiff claims it relied to its detriment. In Count II, plaintiff claims that the $2,753,226.03 value placed upon the pipeline as of the date of transfer was excessive and that, as a result, the United States was given excessive

credit on its water purchases, the return of which sum plaintiff seeks. In Count III, plaintiff claims that the contract terminated after 10 years and that for all water supplied after June 26, 1984, plaintiff was entitled to payment at the same rate as other customers paid rather than the preferential contract rate.

The cross-motions for summary judgment deal only with Count III. Plaintiff bases its argument upon the following contract provision:

II. TERM

This contract shall be for a term of ten (10) years from the date hereof and thereafter until terminated at the option of the government by the giving of written notice not less than thirty (30) days in advance of the effective date of termination.

Plaintiff contends, first, that, because the United States is entitled to terminate the contract at its option upon the giving of written notice while FKAA has no such reciprocal right, the portion of the contract which extends beyond the initial 10-year period is lacking with respect to mutuality of obligation and is therefore voidable under Florida law. It asserts, and the government does not deny, that by letter dated August 17, 1984, plaintiff gave notice of termination of the contract and thereafter demanded payment by the United States for all water that it took, at the system-wide rate applicable to water users generally.

If plaintiff could unilaterally terminate the contract, and if upon termination plaintiff demanded a new price for the water, and the United States, with notice, took the water, there could be an implied contract under which the United States agreed to pay at the rate demanded. *See Cities Service Gas Co. v. United States*, 205 Cl.Ct. 16, 500 F.2d 448 (1974). However, if the express contract remains valid and plaintiff had no right to terminate it unilaterally, there is no basis for the claim of a subsequent implied contract to pay for the water at a rate other than that in the original contract.

■ Plaintiff's claim that the contract was voidable because it lacked mutuality is without merit. A contract does not lack mutuality merely because a particular promise or obligation is not offset by a similar promise or obligation. The pertinent question is whether the agreement as a whole is supported by mutual consideration. *See generally* 1A A. Corbin, *Corbin on Contracts*, § 164 at 83 (1963); 1 S. Williston, *Law of Contracts*, § 104 at 400–01 (3d ed. 1957); J. Calamari and J. Perillo, *The Law of Contracts*, § 70 at 134–35 (1970); E. Farnsworth, *Contracts* § 214 at 77–78 (1982).

In *Mason v. United States*, 222 Ct.Cl. 436, 449, 615 F.2d 1343, 1350, *cert. denied*, 449 U.S. 830, 101 S.Ct. 98, 66 L.Ed.2d 35 (1980), the court stated that if in a contract clause a buyer agrees to purchase a guaranteed minimum quantity of goods, allowing him to purchase more if he wants to but does not obligate him to do so, such clause "ensure[s] mutuality of obligation, and make[s] the contract enforceable by both parties to it."

In *Laclede Gas Co. v. Amoco Oil Co.*, 522 F.2d 33 (8th Cir.1975), an agreement for the purchase and sale of gas from Amoco to Laclede provided that the agreement should remain in effect for one year and would automatically continue in effect for additional periods of one year each unless Laclede, not less than 30 days prior to the expiration of the initial one year period or any subsequent one year period, gave Amoco written notice of termination. More than 2 years after the contract was entered into, Amoco notified Laclede that it was terminating the contract and increasing the price. It claimed that it had the right to do so because, in view of the fact that Laclede alone had the right to terminate, the agreement lacked mutuality. The court held that under established principles of contract law, the agreement did not lack mutuality, explaining (*Id.* at 36–37):

A bilateral contract is not rendered invalid and unenforceable merely because one party has the right to cancellation while the other does not. There is

no necessity "that for each stipulation in a contract binding the one party there must be a corresponding stipulation binding the other." [Citations omitted.]

The important question in the instant case is whether Laclede's right of cancellation rendered all its other promises in the agreement illusory so that there was a complete *failure* of consideration. This would be the result had Laclede retained the right of immediate cancellation at any time for any reason. (Citing Williston and Corbin, *supra.*) * * *

Here Laclede's right to terminate was neither arbitrary nor unrestricted. It was limited by the agreement in at least three ways. First, Laclede could not cancel until one year had passed after the first delivery of propane by Amoco. Second, any cancellation could be effective only on the anniversary date of the first delivery under the agreement. Third, Laclede had to give Amoco 30 days written notice of termination.

In *Payroll Exp. Corp. v. Aetna Cas. & Sur. Co.*, 659 F.2d 285 (2d Cir.1981), it was contended that a crime insurance policy, containing clauses that it was to continue in effect as long as the insured paid premiums but could be cancelled by the insurance company only for nonpayment of premiums, was illusory because the insurer was permanently bound while the insured could cancel at any time simply by not paying premiums. However, the court held to the contrary, because the insured had already performed in part by paying substantial premiums in exchange for the insurer's promises, including its promise not to cancel.

In *Page v. Carolina Coach Co.*, 667 F.2d 1156 (4th Cir.1982), it was held that the absence of mutually binding obligations did not preclude the existence of a lifetime contract of employment. If the employee actually performed services in exchange for the contract, he need not promise to work for the employer for a lifetime for the contract to be binding.

■ In the instant case, the unilateral right of the government to terminate the contract upon notice after an initial 10-year term does not render the contract illusory by vitiating the government's consideration. First, the government transferred to FKAA the pipeline, appurtenant structures, and real estate used by FKAA to provide water service. Second, the government agreed to purchase and pay for water service at the rates provided in the contract for a minimum of 10 years, and in fact did do so. Third, the government agreed not to terminate FKAA's right to sell the water to the government at the agreed rates after the 10 years without giving plaintiff 30 days' written notice in advance. Thus, there was adequate consideration for the plaintiff's obligation to furnish water to the United States, and the right of the United States to terminate upon notice after 10 years does not render the contract illusory.

■ Next plaintiff contends that the contract is for an indefinite term, and therefore it should be construed to be terminable by it upon reasonable notice. However, if by the word "indefinite" plaintiff means "perpetual", the fact that a contract is to have a perpetual term does not invalidate it nor give either party the implicit right to terminate it unilaterally. As Judge Learned Hand stated for the court in *Town of Readsboro v. Hoosac Tunnel & W.R. Co.*, 6 F.2d 733, 735 (2d Cir.1925):

> Had the parties expressed the intention to make a promise for perpetual maintenance, we should, of course, have nothing to say; their words would be conclusive. But they did not, and, as no time is expressly fixed, we must look to the circumstances to learn what they meant.

The Court of Claims, this court's predecessor, stated similarly in *Consumers Ice Co. v. United States*, 201 Ct.Cl. 116, 125, 475 F.2d 1161, 1166 (1973):

> The fact that a contract leaves indefinite the period for performance will not usually invalidate it or make it unenforceable, but the longer the period for performance the heavier the burden on the enforcing party to prove that the extended duration was intended.

And *see also McLean v. United States*, 316 F.Supp. 827 (E.D.Va.1970).

The Florida cases, upon which plaintiff relies, are not to the contrary. In *Joe Regueria, Inc. v. Am. Distilling Co.*, 642 F.2d 826 (5th Cir.1981), a Tampa distributor sued a manufacturer of alcoholic beverages for termination of a contract for an exclusive distributorship, which the plaintiff claimed was to continue as long as Regueria actively promoted American's brands and maintained its share of the sales of American's brands in Florida. In response to American's argument that such a contract was terminable at will by either party because it was for an indefinite term, the court stated (*Id.* at 829–30):

> [W]e must decide whether under Florida law the alleged contract would be construed as an "indefinite contract," which is terminable at will by either party upon reasonable notice. *See Gulf Cities Gas Corp. v. Tangelo Park Service Co.*, 253 So.2d 744 (Fla.Dist.Ct.App.1971); *Florida-Georgia Chemical Co. v. National Laboratories*, 153 So.2d 752 (Fla.Dist.Ct. App.1963). Both *Gulf Cities* and *Florida-Georgia Chemical* define "indefinite contracts" as those wholly lacking in any reference to the duration of the contract. Such contracts are contrasted with "perpetual contracts," which, we infer, may continue perpetually under an agreed upon duration term. The alleged oral agreement in the instant case, which continues until Regueira's promotion or share of American sales in Florida declines, is properly characterized as a perpetual contract and is thus not terminable at will with reasonable notice. [Footnotes omitted.]

■ If, however, by characterizing the term of the contract as "indefinite" plaintiff means that the contract is so vague and uncertain as to how long plaintiff is to supply water to the government and as to how long defendant is obligated to buy water from plaintiff that the court should impute to the parties the intent that either should have the right to terminate at will,

the facts do not support plaintiff's argument. First, the clause pertaining to the period of performance is clear and unambiguous. It provides that "[t]he contract shall be for a term of ten years (10) from the date hereof *and thereafter until terminated at the option of the government.*" [Emphasis added.] The highlighted language indicates that the parties had in mind a contract with a duration limited only by the government's right to terminate. *Cf. McLean*, 316 F.Supp. at 829.

The circumstances underlying the contract also indicate that, apart from the government's exercise of its option to terminate, the parties intended that plaintiff should be bound to supply water to the government as long as plaintiff continues to supply water to the civilian population in the Florida Keys and the government maintains installations therein which require potable water. Prior to the execution of the contract the United States owned and maintained the only conduit for supplying water to the government installations and intended to continue to do so. The transfer to plaintiff was made on condition that even though the government would no longer own or operate the pipeline, it should continue to receive the water it needs. Another indication that the parties intended the contract to be long term and not merely for a limited period may be found in the provisions that the rates were not fixed but were to be renegotiated annually to reflect adjustments in FKAA's costs of operations and maintenance, with failure to agree in any year being subject to proceedings under the standard Disputes Clause. It is difficult to believe that at the same time that the United States made an outright transfer of the facilities to FKAA, it would give the latter the right to terminate after only 10 years the supply contract upon which the government relied as a substitute, allowing FKAA unilaterally to restrict the water to civilian use or to repudiate the agreed rates and charge the government any amount it pleased for the water.[1]

---

1. Plaintiff asserts that Florida substantive law should be applied to determine the validity of

The pleadings and affidavits submitted with the motions indicate that there is no genuine issue of material fact and that defendant is entitled to a judgment dismissing Count III of the complaint as a matter of law. Therefore, defendant's motion for partial summary judgment is granted and plaintiff's motion is denied.

the contract here at issue. This position is frivolous. *See e.g. Ivanhoe Irrigation District v. McCracken,* 357 U.S. 275, 289, 78 S.Ct. 1174, 1182, 2 L.Ed.2d 1313 (1958); *United States v. Allegheny County,* 322 U.S. 174, 183, 64 S.Ct. 908, 913, 88 L.Ed. 1209 (1944). In any event, Florida law is not contrary to the foregoing.