The PRUDENTIAL INSURANCE
COMPANY OF AMERICA

v.

The UNITED STATES.

No. 141–82L.

United States Claims Court.

April 9, 1985.

F. Walter Conrad, Houston, Tex., for plaintiff. Baker & Botts and John T. Simmons, Jr., Houston, Tex., of counsel.

Silvia Sepulveda-Hambor, Washington, D.C., with whom was Acting Asst. Atty. Gen. F. Henry Habicht II, Washington, D.C., for defendant. Howard L. Hardegree, Fort Worth, Tex., of counsel.

OPINION ON DEFENDANT'S MOTION
   TO DISMISS PLAINTIFF'S SPECIAL
   DAMAGES CLAIM, OR IN THE AL-
   TERNATIVE FOR PARTIAL SUM-
   MARY JUDGMENT

PHILIP R. MILLER, Judge:

The government failed to vacate leased premises until 10 months after receiving the lessor's notice of termination of the lease. The government concedes liability for the fair rental value of the space it occupied for the 10-month period. The questions presented are:

(1) Was the government's holding over also a breach of its lease agreement which rendered it liable for special contract damages?

(2) If the answer to (1) is in the negative, may the plaintiff be entitled to reimbursement for the same items of claimed special damages as part of just compensation for a temporary taking?

Statement

Since defendant's motion is addressed to the sufficiency of plaintiff's claims for special damages, the facts referred to herein are derived from the complaint as supplemented by the undisputed underlying documents submitted by the parties in connection with the motion.

On December 28, 1973, the General Services Administration (GSA), leased from Diversified Building Equities, Inc. (Diversified) approximately 8,197 net usable square feet of space in the Pinehollow Office Building in Houston, Texas, to be occupied by the Internal Revenue Service (IRS). The initial term of the lease was from March 1, 1974 through February 28, 1979. By subsequent amendments, the rented area was increased to approximately 14,074 square feet.

On July 1, 1974, plaintiff, Prudential, purchased the Pinehollow building and retained Diversified to manage the building.

Clause 5 of the lease agreement gave the government the option to extend the lease term for a period of 3 years. The government exercised this option on January 5, 1979, requesting a renewal through March 7, 1980. However, clause 13 provided that either party could terminate the lease during the renewal period by giving 90 days' notice in writing to the other party. Pursuant to this clause, on March 27, 1979, plaintiff gave notice of termination, with the effective date to be June 27, 1979.

Upon inquiry from the defendant, plaintiff offered to continue the lease on a tenant-at-sufferance basis for a monthly rental of $15,486 (twice the previous rate specified in the lease), but defendant did not accept the offer. As the result, on July 17, 1979, plaintiff sent GSA a letter demanding that IRS vacate the leased premises immediately. Nevertheless, IRS continued to occupy the premises until April 15, 1980.

During the period that the government's lease was in effect, Prudential also had another tenant in the same building, Cities

Service Company, which occupied 48,274 square feet of space. On November 30, 1979, Prudential and Cities Service entered into a new lease, from November 1, 1979 through June 30, 1986, for 79,533 square feet, which included the space then occupied without a lease by IRS. That lease included a clause allowing Cities Service to terminate if the additional space occupied by the IRS in the Pinehollow Building was not released on or before February 1, 1980.

In its letter of July 17, 1979, plaintiff made defendant aware that it was negotiating a lease for a major portion of the Pinehollow Building to another (unnamed) tenant in the same building, contingent upon the IRS vacating its quarters by October 1, 1979. On August 14 and November 6, 1979, plaintiff made further demands upon defendant to vacate, each time notifying the government that Prudential would suffer considerable damages if the IRS did not vacate the Pinehollow Building immediately.

On March 1, 1980, Cities Service exercised its option to terminate for the stated reason that plaintiff was unable to deliver the second floor space still occupied by the government. It vacated the remainder of its space in the Pinehollow building on July 31, 1980.

Plaintiff asserts that as a result of the holding over defendant owes Prudential the sum of $195,125 in rent for the 14,074 square feet occupied by IRS, less $78,205 in partial payments thereon, leaving a net amount due of $116,920. The government does not dispute that it owes rent at fair market value for the holdover period, but does dispute the plaintiff's claim as to the amount thereof.

In addition, plaintiff claims special damages of $814,723, plus $35,000 in attorneys' fees, consisting of the following:

| Item | Damages |
| --- | --- |
| (1) Loss of rental revenue from a single tenant for the 79,533 square feet, which were to be occupied by Cities Services, less the rent received from seven new smaller tenants for the space. | $327,329 |
| (2) Increase in real estate commissions which plaintiff incurred to obtain the seven new tenants for the 79,533 square feet. | 115,847 |
| (3) Increase in refurbishment expenses required for the seven new tenants in excess of which Prudential had agreed to incur for Cities Service alone for the same space. | 131,114 |
| (4) Increase in base operating costs for the seven new tenants over that required under the Cities Service lease for its 5–year term | 240,432 |
| Total | $814,723 |

Defendant contends in its motion that the claim for special damages must be dismissed because it does not come within the statutory authority of this court, which, insofar as pertinent, is limited to "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (1982). Conversely, plaintiff maintains that the court does have jurisdiction of the claim for special damages, because it arises out of a contract, the lease agreement which preceded the holdover.

*Decision*

I.

Contract Damages

A. Examination of the pertinent clauses of the lease agreement shows that the lessor leased to the government the described premises "TO HAVE AND TO HOLD the said premises with their appurtenances for the term beginning on March 1, 1974, through February 28, 1979, subject to termination and renewal rights as may be hereinafter set forth." (Par. 2.) "This lease may be renewed at the option of the Government, for the following terms and at

the following rentals." (Par. 5.) And "[e]ither party may terminate this lease during the renewal period by giving at least 90 days' notice in writing to the other party, and no rental shall accrue after the effective date of said termination." (Par. 13.) There is no provision obligating the government to vacate the premises at the termination of the lease.

■ At common law a bare lease is merely a conveyance of the lessor's interest in property for a limited term. After the expiration of such term, if the former lessee holds over, the owner's remedy is eviction, or, if he desires monetary compensation, a suit for damages for trespass, assumpsit or unlawful detainer. *See Cohen v. Foodtown Inc.*, 207 A.2d 122, 124 (D.C.1965); *Leonard v. Autocar Sales & Service Co.*, 325 Ill.App. 375, 60 N.E.2d 457, 462 (1945), *cert. denied*, 327 U.S. 804, 66 S.Ct. 968, 90 L.Ed. 1029 (1946); *Clark v. Harry*, 182 Va. 410, 29 S.E.2d 231, 233 (1944); *Bahcall v. Gloss*, 244 Wis. 473, 12 N.W.2d 674 (1944); *Jensen v. Nolte*, 233 Iowa 636, 10 N.W.2d 47 (1943); *Dan Cohen Realty Co. v. National Savings & Trust Co.*, 125 F.2d 288 (6th Cir.1942); *Becker v. Manufacturers Trust Co.*, 262 App.Div. 525, 30 N.Y.S.2d 542 (1941); *State ex rel. St. Louis County v. Evans*, 346 Mo. 209, 139 S.W.2d 967, 969 (1940) (en banc); *Holcombe v. Lorino*, 124 Tex. 446, 79 S.W.2d 307, 310 (1935). And, *see generally* 3 R. Thompson, *Thompson On Real Property*, § 1046 at 168 (6th ed. 1980); 2 R. Powell, *The Law Of Real Property*, § 221 at 179 (1977); 6 S. Williston, *Williston on Contracts*, § 890 at 587 (3rd ed. 1962); 1 *American Law Of Property*, § 3.11 at 203 (A.J. Casner ed. 1952). In addition, some state statutes entitle the lessor to specific kinds of damages against a tenant who holds over, such as double the prior rent or a renewal of the lease.[1]

■ However, this court has no jurisdiction of a suit brought against the United States on any such theory. For plaintiff to

prevail it must bring itself under the jurisdictional umbrella of a claim founded upon an express or implied in fact contract. 28 U.S.C. § 1491(a)(1).

■ As already noted defendant's lease contained no express covenant obligating defendant to vacate the premises after its expiration. Nor could it be implied merely by the provision that the lease was for a limited term. *Goodyear Co. v. United States*, 276 U.S. 287, 48 S.Ct. 306, 72 L.Ed. 575 (1928). In *Goodyear* the United States had occupied leased premises for 6 months beyond the termination date of its lease, and offered to pay the lessor the fair rental value of its occupancy. However, the lessor sued in the Court of Claims for a full year's rental, the measure of damages allowable for a holdover under the Ohio common law. The Supreme Court affirmed the Court of Claims' dismissal of the suit (62 Ct.Cl. 370 (1926)), for lack of jurisdiction, on the grounds that the United States had never agreed to be bound for more than the period of its actual occupancy. The court stated (*Goodyear*, 276 U.S. at 293, 48 S.Ct. at 307):

It is immaterial that under the common law in Ohio as applied between private parties, a lessee holding over after the expiration of his lease is held, at the option of the lessor, to be bound for another year, under an agreement implied in law, regardless of his actual intention, * * *. Not having affirmatively continued the lease beyond the actual period of occupancy, the Government cannot, * * * be bound for a longer term.

Furthermore, independently of that doctrine, the right here invoked to sue the United States under the Tucker Act on a claim founded on contract—as this is— must rest upon the existence of a contract express or implied in fact, no right of action being given by the Act in cases where, if the transaction were between

1. *See* D.C.Code Ann. § 45–1407 (1981) (double rent); Md. [Real Property] Code Ann. § 8–402 (1981) (tenant liable for damages caused by holdover); Va.Code § 55–223 (1950) (tenant liable for any loss or damages sustained by lessor).

private parties, recovery could be had upon a contract implied in law.

■ Plaintiff urges that a covenant by the United States to vacate after the termination of the lease or pay contract damages may be implied here. But for such a covenant to be implied in fact there must exist the same mutuality of intent as in the case of an express covenant. *Id.* And *see also H.F. Allen Orchards v. United States,* 4 Cl.Ct. 601, 605–06, *aff'd,* 749 F.2d 1571, 1575 (Fed.Cir.1984). Plaintiff sets forth no facts either in the lease itself or in the circumstances surrounding its execution which would indicate such mutual intent here. In fact the undisputed circumstances are to the contrary.

If the lessor desired additional protection, it could have insisted on inclusion in the lease contract of a covenant by the lessee to vacate the premised after termination of the lease, on pain of contract damages, liquidated or unliquidated, for its breach. Such clauses are commonplace in commercial leases. *See* 1 S. Williston, *Williston On Contracts: Forms,* §§ 890A, 946 (3d ed. 1979); 11A G. Thompson, *Thompson On Real Property: Forms,* §§ 869, 959 (4th ed. 1965); E. Belsheim, *Modern Legal Forms,* §§ 5085, 5085.1, 5085.2, 5086 (1962). Given the fact (as plaintiff alleges) that Prudential "is an established business involved in leasing properties on a nationwide basis," plaintiff may properly be presumed to have been aware of such clauses and their purpose. Indeed, in its lease agreement with Cities Services, plaintiff inserted just such a covenant.[2] In this instance, however, the lease was on a standard GSA form, prepared by the lessee; and it is, therefore, not surprising that the lessee failed to insert such a covenant.

If it wished to preserve for itself the opportunity to obtain contract damages should the United States hold over, it was up to plaintiff to insist on a covenant requiring the lessee to vacate after termination of the lease. Conceivably, had it done so, the government might have withdrawn as a prospective tenant, as, absent such a clause, the United States always has the right to occupy premises for public purposes merely in return for fair rental value or just compensation. Furthermore, had the United States subscribed to such a covenant, it might well have decided against holding over, in favor of obtaining other leased premises at lesser cost. We may speculate as to the reason for the omission, and as to the lessee's conduct had there been such a clause, but we are not free to supply what the parties omitted from their agreement.

If a covenant to vacate could be implied by the mere fact that a lease has a limited term, an express covenant to vacate would be superfluous or redundant in any lease, including plaintiff's own agreement with Cities Service.

The question of the government's liability for damages resulting from its holding over after the termination of a tenancy has also been addressed by the Court of Claims in a number of cases. When it has held over after the termination of a lease, the United States has been held liable for the fair value of its use and occupancy of a landlord's property, on the theory either that there was an implied contract to pay such fair value or there was a temporary taking of the property with liability for just compensation under the Fifth Amendment. *Consumers Ice Co. v. United States,* 201 Ct.Cl. 116, 128, 475 F.2d 1161, 1168 (1973); *Barcroft Lake Shores, Inc. v. United*

---

**2.** SEC. 24. HOLDING OVER: In the event of holding over by Lessee after the expiration or termination of this lease, such hold over shall be as a tenant at will and all of the terms and provisions of this lease shall be applicable during such period, except that Lessee shall pay Lessor as rental for the period of such hold over an amount equal to twice the rent which would have been payable by Lessee had such hold over period been a part of the original term of this lease, and Lessee will vacate said premises and deliver the same to Lessor upon Lessee's receipt of notice from Lessor to vacate said premises. The rental payable during such hold over period shall be payable to Lessor on demand. No holding over by Lessee, whether with or without consent of Lessor, shall operate to extend this lease except as herein provided.

*States*, 135 Ct.Cl. 623, 626 (1956); *Garrity v. United States*, 107 Ct.Cl. 92, 105, 67 F.Supp. 821, 826 (1946); *Semmes & Barbour v. United States*, 26 Ct.Cl. 119, 130 (1891); and *Kugler v. United States*, 4 Ct.Cl. 407, 414–15 (1868). None of these cases suggests that, in the absence of a clause requiring the government to vacate at the end of the lease term, the government's liability for damages may be founded on the expired lease agreement.

■ Particularly in the case where the government is the lessee, the court is reluctant to impute to the parties merely from the leasing for a limited term the intent that the lessee pay contract damages in the event it does not vacate promptly when the lease expires. Since it is clear that the United States may occupy the premises in return for payment of its fair rental value on the theory of a temporary taking, it is not reasonable to conclude, without specific evidence to support it, that the United States has agreed to pay more than could be required of it in the exercise of its sovereign right.

■ Contrary to plaintiff's contentions, a holding that the lease did not require that the government vacate the leased premises after termination does not render meaningless the clause giving plaintiff the option to terminate after renewal. In the event the fair rental value of the space increased or decreased over the lease term, it permitted the party adversely affected by the existing lease to obtain an adjustment. If the government as lessee was unwilling to execute a new lease with increased rent, it would either have to vacate or pay the fair rental value in any event.

B. In furtherance of its argument that the holdover by the government is a breach of the lease contract, plaintiff cites *Irving Trust Co. v. American Silk Mills, Inc.*, 72 F.2d 288 (2d Cir.), *cert. denied*, 293 U.S. 624, 55 S.Ct. 239, 79 L.Ed. 711 (1934); *United States v. Morgan*, 196 F.Supp. 345 (D.Md.1961), *aff'd*, 298 F.2d 255 (4th Cir. 1962) and 51C C.J.S., *Landlord and Tenant*, § 316(c) at 801–02 (1968). But none of these authorities supports the view that a lease for a term of years must be construed as containing a promise by the lessee to vacate at the conclusion of the term.

*Irving Trust Co.* was a suit for damages expressly provided for by the lease. After the tenant defaulted by nonpayment of rent for 2 months, the lessor gave the tenant notices of termination and to vacate due to the default, but the tenant failed to heed the notice and stayed on for 4 months more without payment of rent. When the lessor sued for the unpaid rent during the period of occupancy plus damages attributable to the lessor's inability to rent premises for 3 months thereafter during the original lease term, the court held that the provisions of the lease entitling the landlord, after default, to repossess the property summarily and to relet it as agent for the tenant, and requiring the tenant to pay to the landlord all of the landlord's expenses in connection with re-entering, re-possessing and reletting the property during the residue of the original term, were sufficiently explicit so as to entitle plaintiff to recover such damages from the tenant. Furthermore, nothing in *Irving Trust Co.* even remotely suggests that the landlord could have recovered damages attributable to another tenant having terminated his lease on different premises because of inability to obtain the premises in question.

*Morgan*, a case in which the United States was the plaintiff-lessor, is also distinguishable in several respects. First, the lessees, expressly warranted that upon termination the they would cause the building to be completely vacated. Second, the claim by the United States was only for rent for the period of actual occupancy beyond the termination date. Third, the court expressly stated that the liability it found was not under the expired lease, but either for unlawful use or occupancy of property belonging to the lessor or for a tort.

Nor does the citation to *Corpus Juris Secundum* support plaintiff's theory herein. Although the treatise states that in general a lessor has a claim for damages for the lessee's delay in surrendering pos-

session after termination of the lease, it does not state that the damages are for breach of the expired lease contract. Examination of the cases cited in support of the statement in *Corpus Juris* likewise fails to show that they are based on the breach of the original expired lease contract rather than on common law trespass, assumpsit, tort, or other theory involving the unauthorized or unlawful deprivation of property to which the landlord was entitled after the termination of the lease. None of such theories can be applicable in this suit, because the United States has not consented to suit in the Claims Court for claims based on tort, trespass, assumpsit, or similar theories.

C. The American Law Institute's *Restatement of the Law Property 2d,* Landlord and Tenant § 14.6 (1977), does allow special damages to a landlord from a holdover tenant. It states:

§ 14.6 Liability of Holdover Tenant for Special Damages

Except to the extent the parties to a lease validly agree otherwise, if no election is made under the rule of § 14.4, the landlord, or incoming tenant, is entitled to recover from a tenant improperly holding over after the termination of his lease for the special damages caused by the holdover which the tenant could reasonably have foreseen at the time of his holding over would result from his conduct, and which the injured party could not reasonably have avoided, unless equitable considerations justify relieving the tenant of some or all of these damages.

In justification for this position, the reporter's note to § 14.6 states:

2. Justification for the present rule— In making a lease, the tenant has contracted, in effect, to surrender the premises upon the termination of the lease. In holding over, the tenant has breached his contract; hence courts are inclined to give the standard measure of damages for breach of contract.

\*　　\*　　\*　　\*　　\*　　\*

4. The requirement of foreseeability—The general rule is that the damages be foreseeable by the tenant at the time the lease is made. See, e.g., *Taylor v. Kaufhold,* 368 Pa. 538, 84 A.2d 347, 32 A.L.R.2d 575 (1951). The other view is that holding over is a tort, damages for which need not be foreseeable by the holdover tenant, but only the proximate result of the holding over. See, e.g., *Nodine v. State,* 192 Misc. 572, 79 N.Y. S.2d 834 (Ct.Cl.1948).

The Restatement modifies the general rule by making the holdover tenant liable for those damages which were foreseeable at the time of his breach of contract, i.e., when he holds over, as opposed to the time of the making of the lease. There is limited support for this position; see § 10.2 on damages and the Reporter's Note thereto.

However, the position taken by the *Restatement of Property* is not persuasive herein.

First, the authorities which the reporter's note cites do not support the Restatement's position that in entering into a lease for a limited period the tenant has agreed as a matter of contractual obligation to vacate the premises at the termination of the lease term. The authorities cited in support of paragraph 2 of the reporter's note are: *McCullagh v. Goodyear Tire & Rubber Co.,* 342 Mich. 244, 69 N.W.2d 731 (1955); *Taylor v. Kaufhold,* 368 Pa. 538, 84 A.2d 347, 32 A.L.R.2d 575 (1951); 1 *American Law of Property* § 3.36 (A.J. Casner ed. 1952). And *see generally* 32 A.L.R.2d 582 Annot. (1953). However, *McCullagh* allowed special damages not for a breach of contract but under a Michigan statute entitling the landlord to special damages in an action for trespass against a holdover tenant. *Taylor* involved an express covenant in the lease to deliver up the premises to the lessor in good order and repair at the end of the term, and the court thought that it did not make any difference in the result whether the recovery of special damages was attributable to breach of contract or trespass.

Casner's *American Law of Property* states that at common law the lessor's remedy was either an action in trespass or assumpsit. While it also states that special damages ought to be recoverable, it finds it unnecessary to decide "whether the theory of the action is tort or contract." The authorities Casner cites likewise do not base the recovery of special damages on a contract theory, where there is no express agreement to vacate at the end of the lease term.

Examination of the cases in the annotation at 32 A.L.R.2d 582 similarly do not support the thesis that the mere agreement by the lessee to lease for a limited term involves an intent in fact to warrant that he will vacate at the end of the term. The cases cited in the annotation are all distinguishable because they are based upon theories of trespass, assumpsit, taking of property unlawfully, statutory remedies, or express agreements to vacate.

Second, the reporter's note at paragraph 4 concedes that § 14.6 is based upon a tort damage theory rather than contract, insofar as the special damages need not be foreseeable by the tenant at the time the lease is made but only need be the proximate result of the holding over.

Third, insofar as § 14.6 allows "equitable considerations" to relieve the tenant from the special damages, it is also apparent that the rule is not based on contractual intent. The illustrations in the reporter's notes indicate that if the tenant's holding over is not willful, such as where the tenant has suffered a heart attack or is otherwise ill, this may excuse him from liability for special damages; but under ordinary contract law this would depend upon the intent of the parties at the time they entered into the contract rather than on equitable considerations. *Northern Helex Co. v. United States,* 207 Ct.Cl. 862, 877–78, 524 F.2d 707, 720 (1975), *cert. denied,* 429 U.S. 866, 97 S.Ct. 176, 50 L.Ed.2d 146 (1976), *citing, Globe Refining Co. v. Landa Cotton Oil Co.,* 190 U.S. 540, 544, 23 S.Ct. 754, 755, 47 L.Ed. 1171 (1903).

■ Thus, although the Restatement's rule purports to be one of contract, it imposes obligations as a matter of law which do not necessarily result from the express or implied agreement or intent of the parties.[3] It is well settled that this court does not have jurisdiction to award judgment upon a claim based on a contract implied in law. *Goodyear Co. v. United States,* 276 U.S. 287, 293, 48 S.Ct. 306, 307, 72 L.Ed. 575 (1928); *Merritt v. United States,* 267 U.S. 338, 341, 45 S.Ct. 278, 279, 69 L.Ed. 643 (1925).

C. Finally, even if in the agreement to lease for a limited term of years there could be imputed to the United States the intent to agree to vacate the premises upon termination, it is difficult to comprehend how the damages which plaintiff seeks could be foreseeable at the time the United States entered into the lease. The lease was executed in 1973 between Prudential's predecessor, Diversified, and the United States, before Prudential acquired the property. Certainly at that time it was not

---

**3.** See *Herter v. Mullen,* 159 N.Y. 28, 43–44, 53 N.E. 700, 705 (1899):

It is also well-settled that, where a duty or charge is created by law, and the performance is prevented by inevitable accident or the act of God, without fault of the party sought to be charged, he will be excused, but where a person absolutely, and by express contract, binds himself to do a particular thing, which is not at the time impossible or unlawful, he will not be excused, unless through the fault of the other party. The reason given for the latter portion of this rule is that he might have provided by his contract against inevitable accident or the act of God. (citations omitted) Thus the most that can be said of the obligation that arises from the relation of landlord and tenant and follows by a general lease is that the tenant is charged with the duty of vacating the premises at the end of his term. If he fails, it is a breach of his duty, and ordinarily the law implies or creates a liability on his part for another year's rent. This being a duty implied or created by law, and not an express or absolute agreement, it falls within the first part of the foregoing rule, and hence it is obvious that, if the tenants removal was rendered impossible by inevitable accident or the Act of God, he is excused for his omission to surrender the premises, at least so far as it creates a liability for a year's rent which is implied by law.

foreseeable by the tenant that, if and when it held over after notice of termination, it could cause the landlord to be damaged not only by the loss of a tenant for the leased property but also by the loss of a lease for other property of a size far in excess of that occupied by the United States, and that the landlord would also be damaged by having to subdivide the other property for a multiplicity of tenants. Indeed, Prudential did not even enter into the lease with Cities Service for the combined premises, which Cities Service terminated, until 4 to 5 months after termination of the government's lease. *See Northern Helex,* 207 Ct.Cl. at 877–88, 524 F.2d at 720.

■ D. To the extent that plaintiff must rely upon the implied contract arising from the fact of the holdover occupancy itself, it is not entitled to the kind of damages the plaintiff seeks here, because the implied contract is only to pay the fair value of the use and occupancy, not damages arising out of the loss of another tenant for different space nor the loss of potential profits from a different lease agreement with another tenant.

## II

### Just Compensation

■ Although defendant concedes that plaintiff is entitled to just compensation under the Fifth Amendment for a taking by the United States, in its briefs defendant fails to argue in support of its assumption that the special damages asserted by plaintiff may not be reflected in the determination of such just compensation.

In *United States ex rel. T.V.A. v. Powelson,* 319 U.S. 266, 281, 63 S.Ct. 1047, 1055, 87 L.Ed. 1390 (1943), the Supreme Court reminded us that "it is the owner's loss, not the taker's gain, which is the measure of compensation for the property taken." *Id.* at 281, 63 S.Ct. at 1055. And in determining that compensation, it stated, the fair market value to which the owner is entitled "may be determined in light of the special or higher use of the land when combined with other parcels; it need not be meas-

ured merely by the use to which the land is or can be put as a separate tract" (*id.* at 275, 63 S.Ct. at 1052); although it also cautioned that "in order for that special adaptability to be considered, there must be a reasonable probability of the lands in question being combined with other tracts for that purpose in the reasonably near future" lest "the chance of their being united for that special use [be] regarded 'as too remote and speculative to have any legitimate effect upon the valuation.'" *Id.* at 275–76, 63 S.Ct. at 1052–53.

In *Powelson* the Court held that the value of an electric power company's land at the time of its condemnation by the federal government could not be enhanced because of the possibility that it could have but did not in fact exercise a power of eminent domain of its own, delegated to it by the state, to enable it to add to that tract other land and construct a large hydroelectric power project. *Id.* at 284, 63 S.Ct. at 1057. The Court found that possibility too speculative to add to the value of the condemned land or to be property in itself. *Id.* at 285, 63 S.Ct. at 1057. Whether or not the additional value which plaintiff claims here is too speculative to be regarded as property or to enhance the value of the property taken will have to be determined at trial.

In *United States v. General Motors Corp.,* 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945), the Supreme Court considered, as a question of first impression, the measure of just compensation owed to a lessee of a warehouse under a long term lease, for the government's condemnation of the occupancy of such warehouse space for a one-year period. The government offered to pay only for the value of its short term occupancy carved out of the long term lease of an empty warehouse, while General Motors contended for reimbursement also of its actual expense of removing its automotive parts, bins, fixtures and equipment stored in the building. The Court disagreed with both positions. It held that, when the government takes less than the entire interest of a citizen and leaves him holding the remainder, payment of merely

market rental value is not the just compensation which the Fifth Amendment contemplates, but rather (*id.* at 382, 65 S.Ct. at 361)—

> The value of such an occupancy is to be ascertained, not by treating what is taken as an empty warehouse to be leased for a long term, but what would be the market rental value of such a building on a lease by the long-term tenant to the temporary occupier.

It stated that some of the elements which would certainly and directly affect the market price agreed upon by a tenant and a sublessee in such a transaction would be the reasonable cost of moving out the property stored and preparing the space for occupancy by the subtenant, including labor, materials and transportation, as well as the storage of goods against their sale or the cost of their return to the warehouse at the conclusion of the temporary taking of the building. *Id.* at 383, 65 S.Ct. at 361. It then explained (*id.*):

> Such items may be proved, not as independent items of damage but to aid in the determination of what would be the usual—the market—price which would be asked and paid for such temporary occupancy of the building then in use under a long-term lease. The respondent offered detailed proof of amounts actually and necessarily paid for these purposes. We think that the proof should have been received for the purpose and with the limitation indicated. Proof of such costs as affecting market value is to be distinguished from proof of value peculiar to the respondent, or the value of good-will or of injury to the business of the respondent which, in this case, as in the case of the condemnation of a fee, must be excluded from the reckoning. [Citations in footnote omitted.]

In *Kimball Laundry Co. v. United States,* 338 U.S. 1, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949), the Supreme Court again held that the just compensation required for a temporary taking of property for a limited period is not necessarily confined to the value of the occupancy of the physical assets for the limited period, but may include as well the loss of related intangible values suffered by the owner which could have been anticipated at the time of taking and would have been taken into account in fixing a rental value. This was a factual matter which required a trial.

The issue here as to the value to be paid for the government's taking is both factual and difficult. If we take the approach of *General Motors* and *Kimball Laundry,* that value is to be determined at the time of the taking and the measure is what would have been arrived at in an arms length rental, we encounter the dilemma (on the present record at least) that the taking was not for a definite term. Was there a taking initially for a 10-month period, or was there a taking each month or each day when the government chose to continue to occupy the premises? If the former, how could the plaintiff have lost the value of the Cities Service lease when it was not entered into until 5 months after the government began its holding over? If the latter, when did the loss occur? Was the Cities Service lease at fair market value for similar space? If so, how can Cities Service's exercise of its option to terminate constitute a loss to plaintiff when the property still retained its value? These and other questions will have to be resolved on all of the facts at trial.

### Conclusion

For the foregoing reasons, it is concluded that plaintiff is not entitled to the special damages which it claims on the theory of a breach of contract, and that the government's motion to dismiss or for partial summary judgment with respect to such claim must be allowed. However, the United States is still liable for the fair value of its use and occupancy of the premises which it held over. As there is a dispute between the parties as to such fair value, that issue remains for trial.